# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 19 2017, 6:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR
APPELLANT/FATHER

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEY FOR
APPELLANT/MOTHER

Timothy E. Stucky
Stucky, Lauer & Young, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re: the Termination of J.O-E., JH.O-E., M.N. and A.N. (minor children) <br><br> and <br><br> Ar.N. (Father) and Me.N. (Mother), <br><br> *Appellants-Respondents,* <br><br> v. <br><br> The Indiana Department of Child Services, | July 19, 2017 <br><br> Court of Appeals Case No. 02A04-1701-JT-143 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Sherry A. Hartzler, Judge <br><br> The Honorable Lori K. Morgan, Magistrate <br><br> Trial Court Cause Nos. 02D08-1512-JT-159 02D08-1512-JT-160 |

**Pyle, Judge.**

## Statement of the Case

Me.N. ("Mother") and Ar.N. ("Father") each appeal the termination of the parent-child relationship with their children M.N. ("M.N.") and A.N. ("A.N."). Mother also appeals the termination of the parent-child relationship with her older children J.O-E. ("J.O-E.") and JH.O-E ("JH.O-E") Both parents claim that there is insufficient evidence to support the terminations. Specifically, both parents argue that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside the home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to the children's well-being; (3) termination of the parent-child relationship is in the children's best interests; and (4) there is a satisfactory plan for the care and treatment of the children. Concluding that there is sufficient evidence to support the termination of the parent-child relationships, we affirm the trial court's judgment.

We affirm.

## Issue

The sole issue for our review is whether there is sufficient evidence to support the terminations.

## Facts

Mother is the parent of N.E., who was born in 2001; twins J.O-E. and JH.O-E, who were born in 2002; M.N., who was born in 2005; and A.N., who was born in 2014. Father is the parent of M.N. and A.N.[1] In September 2012, Mother and Father entered into an informal adjustment with DCS, which required the parents to maintain a clean and safe home and ensure their children's school attendance. When Mother and Father failed to follow the terms of the adjustment, N.E., J.O.E., JH.O-E, and M.N. were adjudicated to be children in need of services ("CHINS") in April 2013. Both parents were court-ordered to follow a parent participation plan that required them to: (1) maintain clean, safe, and appropriate housing at all times; (2) obtain a family functioning assessment and follow the recommendations; (3) enroll in Stop Child Abuse and Neglect's ("SCAN") home-based services program, participate in all sessions, and successfully complete the program; (4) enroll in individual

---

[1] N.E.'s father lives in Mexico, and the father of J.O-E. and JH.O-E lives in Guatemala. Neither of these fathers is a party to this appeal.

counseling, attend all sessions, and successfully complete the program; and (5) ensure the children attended school daily.[2]

[4]     The children initially remained with their parents following the CHINS adjudication. However, the children were removed from the home in May 2013 and returned to the home for a trial visit in June 2013. In December 2013, the children were removed from the home again because of "educational neglect and a dirty home." (Tr. 139). Specifically, the children's schools were constantly calling DCS Family Case Manager Alisa Shank ("Case Manager Shank") to let her know that the children "had a very strong odor about themselves and their belongings . . . and that's when they were in school . . . ." (Tr. 139). All of the children had excessive absences and tardiness. In addition, the house had become uninhabitable. There was clutter throughout the house as well as dog feces and clothes on the floor. Mother also had feral cats, which sprayed on clothing and furniture and left a strong smell of ammonia. At one point the police went to the home because the neighbors had complained that the smell was so bad that they thought it was a meth house.

[5]     Three years after the children were adjudicated to be CHINS, DCS filed petitions to terminate the parent-child relationships in late December 2015 and early January 2016. Testimony at the termination hearing revealed that the parents had failed to comply with the court-ordered parent participation plans.

---

[2] A.E. was born after the four oldest children were adjudicated to be CHINS. She was removed from the home and adjudicated to be a CHINS shortly after her birth in February 2014.

First, Mother and Father had never been able to provide clean, safe, or appropriate housing. Testimony from Case Manager Shank revealed that Mother and Father had lived in three houses that had been condemned while they were living in them. Mother and Father had eventually ended up living at Father's auto shop. At the time of the hearing, Father had sold the auto shop and relocated to Georgia. Mother still lived in the Fort Wayne area but did not have "independent housing." (Tr. 214). In addition, although Mother and Father participated in SCAN's home-based services program, neither parent was able to successfully complete the program. SCAN Family Coach Megan Brendell ("SCAN Coach Brendell") testified that Father stopped responding to her texts and messages in February 2016, and Mother walked out of their last appointment in June 2016.

[6] Dockside Therapist Steve Hanan ("Therapist Hanan") met individually with both Mother and Father. Therapist Hanan testified that Mother, who had been diagnosed with bipolar disorder and borderline personality disorder, "never attained . . . what we'd call success in any of her goals." (Tr. 60). According to Therapist Hanan, Mother, who "would always slip back into a chaotic lifestyle," had terminated therapy. (Tr. 60). Therapist Hanan further testified that Father "left therapy at a very short duration." (Tr. 70). SCAN Family Coach Tonya King ("Family Coach King"), who supervised family visits testified that the visits were chaotic. Mother spent most of her time with fifteen-year-old N.E. and told the other children that N.E. was "her king." (Tr. 99). Mother also told the other children that N.E. was her favorite and that she

loved him the most. Family Coach King was concerned that during one of the visits, Mother encouraged and praised N.E. for making racial slurs in front of the other children.

[7] Case Manager Shank testified that she recommended terminating the parent-child relationships because she "fear[ed] for [the] children going back into the situation because it wasn't rectified [. . .] it wasn't ever going to be rectified." (Tr. 159). DCS Family Case Manager Erica Bashara ("Case Manager Bashara") also recommended terminating the parent-child relationships. Specifically, Case Manager Bashara testified that DCS had filed the petition to terminate the parental relationships because the "original situation which [had] gotten [DCS] involved with this family had not been remedied [and] if anything we've seen worse than what we started with." (Tr. 184). Case Manager Bashara further testified that termination was in the children's best interests and that the plan for the care and treatment for the children was adoption. Guardian Ad Litem Mark Thoma ("GAL Thoma") testified that he did not believe it was appropriate to terminate the parental relationship between Mother and N.E. because the mother and son shared a close bond. Specifically, GAL Thoma did not believe that N.E. would consent to be adopted, and N.E. had stated throughout the course of the proceedings that he planned to stay in contact with Mother. On the other hand, GAL Thoma testified that termination of the parent-child relationships was in the best interests of J.O-E., JH.O-E, M.N., and A.N.

Following the hearing, the trial court issued an order terminating the parental relationships between Mother and J.O-E., JH.O-E, M.N., and A.N.[3]  Each parent separately appeals the terminations.

# Decision

The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Id.* at 1188.  Termination of the parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.*  Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

---

[3] The trial court did not terminate the parental relationship between Mother and N.E.

placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013).

[11] When reviewing a termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We consider only the evidence and any reasonable inferences to be drawn therefrom that support the judgment and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *K.T.K.*, 989 N.E.2d at 1229.

[12] When the trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.S.*, 56 N.E.3d at 628. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside a trial court's judgment terminating a parent-child relationship

only if it is clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts or inferences to be drawn therefrom that support them. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[13] Mother and Father both argue that DCS failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside the home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to the children's well-being. However, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed*. We therefore discuss only whether there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for their placement outside the home will not be remedied.

[14] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration

evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.*

[15] Here, our review of the evidence reveals that the children were removed from Mother and Father because of "educational neglect and a dirty home." (Tr. 139). Evidence at the termination hearing revealed that Mother and Father had never been able to provide clean, safe, or appropriate housing. Specifically, Case Manager Shank testified that during the course of the CHINS proceeding, Mother and Father had lived in three houses that were condemned while they were living in them. Mother and Father eventually ended up living in Father's auto shop. At the time of the hearing, Father had sold the auto shop and relocated to Georgia. Mother remained in the Fort Wayne area but still did not have "independent housing." (Tr. 214). In addition, Case Manager Shank testified that the situation that resulted in the children's removal had not been and would never be rectified. Case Manager Bashara testified that the "original situation which [had] gotten [DCS] involved with this family had not been remedied [and] if anything we've seen worse than what we started with." (Tr.

184). In addition, service providers such as SCAN Coach Brendell and Therapist Hanan testified that Mother and Father had failed to successfully complete their programs. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in the children's removal would not be remedied. We find no error.

[16] Next, Mother and Father both argue that there is insufficient evidence that the termination was in the children's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. "'A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that continuation of the parent-child relationship is contrary to the child's best interest.'" *In re B.D.J.*, 728 N.E.2d 195, 203 (Ind. Ct. App. 2000) (quoting *Matter of Adoption of D.V.H.*, 604 N.E.2d 634, 638 (Ind. Ct. App. 1992), *trans. denied, superceded by rule on other grounds*). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[17]   Here, our review of the evidence reveals that Mother and Father have historically been unable to provide housing, stability, and supervision for their children and were unable to provide the same at the time of the termination hearing. In addition, Case Managers Shank and Bashara testified that termination was in the children's best interests. The testimony of these service providers, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in the children's best interests.

[18]   Last, both parents argue that DCS does not have a satisfactory plan for the children's care and treatment. This Court has previously explained that the plan for the care and treatment of the children need not be detailed, so long as it offers a general sense of the direction in which the children will be going after the parent-child relationships are terminated. *In re L.B.,* 889 N.E.2d 326, 341 (Ind. Ct. App. 2008). Here, Case Manager Bashara testified the plan for the care and treatment of the children was adoption. This is a satisfactory plan. *See In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).

[19]   We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

Affirmed.

May, J. and Brown, J., concur.